# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

Facebook users that are stored at premises owned,
maintained, controlled, or operated by Facebook, a
company headquartered in Menlo Park, California:
Facebook Account: "Bill Bill," UID:
100007474267345; Facebook Account: Crystal C
Mack Hall; UID "ceison"; and Facebook Account:
MADDY SANTAELLA.

)
)
)
)
)
)

Case No. **15-M-043**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of
perjury that I have reason to believe that on the following person or property:

Exhibit A

located in the Eastern District of Wisconsin, there is now concealed:

Exhibit B

The basis for the search under Fed. R. Crim P. 41(c) is:
  ☒ evidence of a crime;
  ☒ contraband, fruits of crime, or other items illegally possessed;
  ☒ property designed for use, intended for use, or used in committing a crime;
  ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 18 U.S.C. §§ 1591, 1952 and 2421.

The application is based on these facts: See attached affidavit.

_____
*Applicant's signature*

Heather N. Wright, FBI Special Agent
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: __Nov. 10, 2015__

_____
*Judge's signature*

City and State: __Milwaukee, Wisconsin__          Hon. David E. Jones          , U.S. Magistrate Judge
                                                        *Printed Name and Title*

I, Heather N Wright, being duly sworn, depose and state as follows:

## AFFIANT BACKGROUND

1. I make this affidavit in support of an application for a search warrant authorizing the search of social media sites described in Attachment A to this Affidavit.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been employed by the FBI since July 2010. I am currently assigned to the Wisconsin Human Trafficking Task Force which investigates the illegal trafficking of persons both domestic and foreign for the purposes of labor and commercial sex acts. I gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state and federal law enforcement agencies. Prior to my assignment with the Milwaukee Division of the FBI, I was employed both as a Programmer Analyst for web applications from September 1999 through March 2001 as well as an Automation Engineer from June 2003 through July 2010 within the Pharmaceutical manufacturing industry.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested information and does not set forth all of my knowledge about this matter.

4. This affidavit relates to WILLIAM C. ADAMS [hereinafter "ADAMS"], also known as "BILL BILL" and "BILL", date of birth November xx, 1981, who is currently under federal investigation for violations of various federal sex-trafficking offenses. This Affidavit is based upon my personal knowledge and upon information reported to me by other law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. The investigation has involved law enforcement officers and from the FBI, the Milwaukee Police Department [hereinafter "MPD"], Wisconsin Department of Justice Division of Criminal Investigation [hereinafter "DCI"], the North Dakota Bureau of Criminal Investigation [hereinafter "BCI"],

Williams County Sherriff's Department, Sheboygan County Sherriff's Department and the United States Attorney's Office.

## IDENTIFICATION OF THE LOCATIONS TO BE SEARCHED

5. (A) Facebook Account: "Bill Bill", #: 100007474267345; (B) Instagram Account: "Bill.Bill"; (C) Facebook Account: "MADDY SANTAELLA"; and (D) Facebook Account: "Crystal C Mack Hall", #: "ceison."

6. On October 28, 2015, an FBI analyst sent a preservation request letter to Facebook for the Adams "Bill Bill" Facebook and Instagram accounts and the Crystal Hall "Crystal C Mack Hall", #: "ceison" Facebook account. On October 30, 2015, an FBI analyst sent a preservation request letter to Facebook for the Madeline Santaella "MADDY SANTAELLA" Facebook account.

## APPLICABLE LAW

7. This investigation concerns alleged violations of the following federal offenses, among others: Title 18, U.S.C. §1591, titled "Sex Trafficking of children or by force, fraud or coercion," which, in summary, states that any person who recruits, entices, harbors, transports, obtains, or maintains a person, in or affecting interstate commerce, either while knowing, or in reckless disregard of the fact, that force, threats of force, fraud, or coercion would be used to cause such a person to engage in a commercial sex act or while knowing, or in reckless disregard of the fact, that such person had not attained the age of 18 years and would be caused to engage in a commercial sex act, shall be guilty of an offense against the United States.

8. Title 18, U.S.C. §1952, titled, "Interstate and foreign travel or transportation in aid of racketeering enterprises," which, in summary, states that whoever travels in interstate commerce with intent to promote, manage, establish, carry on, or facilitate the promotion,

2

establishment, or carrying on of a prostitution, shall be guilty of an offense against the United States.

9. Title 18, USC § 2421, known as the "Mann Act," which, in summary, states that whoever knowingly transports any individual in interstate commerce, with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be guilty of an offense against the Unites States.

## GENERAL ALLEGATIONS

10. Through my training, experience, and consultation with other law enforcement officers, I have learned that more often than not:

   a. Individuals involved in the business of illicit commercial sex, a.k.a. "pimps," and oftentimes their prostituted victims, maintain records, including electronic files, in their residences, related to their illicit business on computers and computer servers hosting internet applications such as electronic mail (email) and personal social networking web pages;

   b. Individuals involved in the business of illicit commercial sex solicit clients through electronic advertisements and other media, including social media;

   c. Individuals involved in the business of illicit commercial sex maintain records of correspondence relating to client contact information as well as travel and lodging arrangements involved in such illegal activity;

   d. Individuals involved in the business of illicit commercial sex maintain documents and files containing names of associates and/or coconspirators involved in prostitution;

   e. Individuals involved in the business of illicit commercial sex maintain financial records, bank statements, money orders, money order receipts, and cash that are evidence of payments made in conjunction with prostitution;

3

f.  Individuals involved in the business of illicit commercial sex earn income in the form of cash and try to legitimize these profits. In order to do this, subjects frequently attempt to secrete, transfer, and conceal the money by various means, including: placing assets in names other than their own, including their prostituted females, to avoid detection while maintaining control; laundering the money through what appears to be legitimate businesses; hiding money in their homes, safes, and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at the residences of individuals involved in illicit commercial sex;

g.  Individuals involved in the business of illicit commercial sex often keep and maintain large amounts of bulk United States currency at their residences. Such funds are often used for everyday expenditures and to maintain and finance their ongoing illegal activity;

h.  Individuals involved in the business of illicit commercial sex use cellular telephones, personal digital assistants (PDAs), desktop and notebook computers and maintain these items on their person and/or in their residences and/or business fronts. Individuals involved in the business of illicit commercial sex use cellular telephones, personal digital assistants (PDAs), and notebook computers to increase their mobility, coordinate illicit activities, and to provide pimps and prostitutes with instant access to phone calls, voice messages, text messages, instant messaging (IM) and internet based correspondence. These electronic devices allow individuals involved in illicit commercial sex to maintain contact with other pimps, prostitutes, complicit businesses, and clients. These electronic devices contain wire and electronic data concerning telephonic contact records, text messages, and electronic mail messages with co-conspirators and clients,

4

as well as telephone books containing contact information for co-conspirators and clients. Individuals involved in illicit commercial sex also utilize digital cameras, cellular telephones, personal digital assistants (PDAs), desktop and notebook computers with photograph and video capabilities to take photographs and videos of themselves as well as other coconspirators for the purpose of electronic advertising and promotion of prostitution. Moreover, I know that digital evidence can be stored on a variety of systems and storage devices including: hard disk drives, floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magneto optical cartridges, personal digital assistants, pagers, money chips, thumb drives, flash drives, and portable hard drives and that these storage devices are usually kept at the residences of those so involved;

i.     Individuals involved in the business of illicit commercial sex frequently advertise prostitution services on the internet by using computers to post advertisements on websites such as Backpage.com. These advertisements frequently contain nude, semi-nude, and/or provocative photographs of the individuals being advertised. These advertisements almost always contain prices for services, and language, which denotes the type of services which are available, in a coded or abbreviated language. These services are typically advertised by type of service or length of time. These advertisements often reference a telephone number that is to be called to make arrangements for prostitution purposes.

j.     Individuals involved in the business of illicit commercial sex commonly take the photographs for the prostitution advertisements on cameras, cellular telephones, IPods, IPads, and other electronic devices. These photographs can then be uploaded directly to the Internet, or transferred to another electronic medium. Pimps frequently retain

5

photographs of current and former prostituted individuals in photo albums or other hard copy media and/or on electronic devices, including telephones and computers.

k. Individuals involved in the business of illicit commercial sex also utilize cellular telephones to contact the individuals the pimp prostitutes in the commercial sex trade, through direct conversation and text messaging. These instructions commonly include when and where to work, and instructions regarding charges for particular sexual services. Pimps commonly retain contact information and photographs of current and former individuals the pimp prostituted on cellular phones;

l. Individuals involved in the business of illicit commercial sex often drive vehicles, sometimes rented, leased, or falsely registered in the names of nominees, to transport themselves, their prostituted females, and coconspirators, inter and intra state, to pre-arranged meetings with clients to engage in prostitution and to purchase items used in the prostitution business.

**PROBABLE CAUSE**

11. I submit that there exists probable cause to believe that ADAMS: by means of force, fraud (false promises), or coercion, has forced or encouraged numerous adult females to engage in prostitution. That ADAMS also forced each of the females to give him the proceeds of the prostitution activities. That ADAMS regularly used force or the threat of force, as well as fraud, toward each of the females if they did not comply with his commands to engage in prostitution and to give the proceeds of the prostitution activities to ADAMS. That the reason for the force, threat of force, or fraud used against any female was done so in order to further his criminal enterprise.

6

12. On 01/15/2013, a source of information, known to law enforcement but for his/her protection and for the purposes of this Affidavit, called "SOI#1," provided information on ADAMS to MPD Detective Thomas Dineen and MPD Detective Dawn Jones.

13. SOI#1 stated that he/she knew of a pimp named William ADAMS who goes by the nickname "Bill Bill." SOI#1 stated that he/she had known ADAMS since approximately the year 2000 and has spent a good deal of time in ADAMS'S company. SOI#1 stated that as of the time of the interview, ADAMS had approximately seven or eight females in his "stable" (term used in reference to females that work for a particular pimp) at the time of the interview. SOI#1 stated that he/she knew about ADAMS'S "enterprise" because SOI#1 frequently has conversations with ADAMS about ADAMS'S operation. SOI#1 added that ADAMS liked to brag as well and was arrogant. Based on conversations with ADAMS, SOI#1stated that ADAMS sends the majority of his females out of town to work, but always keeps two females in Milwaukee, WI with him. SOI#1 stated that the two females live with him in his condo in the area of 107th and Bradley in Milwaukee, Wisconsin. SOI#1 stated that the females are "working" while out of town, conducting prostitution dates, and sending the money back to ADAMS. SOI#1 stated that the females send the money back to ADAMS each day. SOI#1 stated that SOI#1 has observed ADAMS slapping females in the past, but he/she has not seen that very often because ADAMS'S females are usually in line and acting the way ADAMS wants them to. SOI#1 stated ADAMS keeps his females away from each other and also keeps them away from people he knows in Milwaukee. Based on conversations with ADAMS, SOI#1 believed that ADAMS made approximately $50,000 - $60,000 per month from prostitution dates conducted by his females. SOI#1 stated he/she had been with ADAMS when ADAMS picked up money sent from his females. SOI#1 stated that ADAMS told SOI#1 that each of his females sent him $2800 - $3000 per day either through Western Union, Money Gram, or Green Dot cards. Based on

7

conversations with ADAMS, SOI#1 stated that he/she also believed that the females steal from the prostitution customers. SOI#1 stated that, based on his personal observation, ADAMS owns and wears a lot of jewelry and expensive watches and glasses. SOI#1 stated that ADAMS drove his cars to the downtown Milwaukee area of Water Street where white females frequent and would pull up to a club with three pearl white cars all in a row just to show off his money and cars to the white females. ADAMS did this in an attempt to recruit white females to prostitute for him.

14. On 10/8/2013, MPD Detective Tom Dineen and FBI Agent Travis Homer met and interviewed Confidential Human Source (CHS) S-00058479 [hereinafter "CHS#1"]. CHS#1 placed a consensually recorded telephone call to an adult female, known to law enforcement, but for her protection and for the purposes of this Affidavit, called "SOI#2". SOI#2 stated to CHS#1 that she used to work for "Bill Bill" aka ADAMS, and worked under a female with the nickname "Goldy." It was "Goldy's" job to watch and keep track of SOI#2 for "Bill Bill." SOI#2 stated that "Goldy" was beaten with an extension cord and had black eyes as a result of ADAMS'S physical abuse. ADAMS instigated arguments between Goldy and Goldy's family so "Goldy" had nobody to fall back on for help. SOI#2 told CHS#1 that SOI#2 got into a fight with ADAMS'S bottom (most trusted prostitute), RASHEDA J. ROSS, DOB: 12/xx/1977, over SOI#2 leaving ADAMS in a Minot, ND Walmart. SOI#2 told CHS#1 that ROSS had been with ADAMS for 12 to 13 years. SOI#2 told CHS#1 that once a female was not part of ADAMS'S team, they no longer wanted that person working in North Dakota. SOI#2 stated that ADAMS'S females would harass and run the girl out of town. SOI#2 told CHS#1 that ADAMS'S females go out of town for two months and then would come back to Milwaukee for a month vacation. During the "vacation" or time back in Milwaukee, ADAMS would pay the female a $2000-1000 allowance; however, if the female

8

"acted up", they were put "on punishment," which meant that the female had to stay in a house and could not leave.

15. SOI#2 further stated that "Goldy" and ROSS both opened Wells Fargo bank accounts in Minot, ND. The money that the females made was placed into these accounts and ADAMS, who was located in Milwaukee, would use a debit card to withdraw the funds. SOI#2 advised that the females would wire money from ND to WI as well. SOI#2 told CHS#1 that a female named "DONNA" was ADAMS'S girlfriend and was always with ADAMS. SOI#2 stated that "DONNA" worked at a US BANK somewhere in Milwaukee.

16. On 04/27/2015, Investigator Traas and Detective Eric Pashley of the Sheboygan County Sheriff's Department, met and interviewed a source of information known to law enforcement but for his/her protection and for the purposes of this Affidavit, called "SOI#3." SOI#3 stated that he/she is aware of a male, "Bill" using Instagram Account, Bill.Bill, with the nickname "moneymob," running (pimping) females out of the Milwaukee Silk Exotic Gentleman's Club where SOI#3 is employed. This Instagram Account is known to law enforcement to belong to ADAMS. SOI#3 stated that the females that work for ADAMS usually end up "going somewhere out west to South or North Dakota." SOI#3 stated that at one time, ADAMS asked SOI#3 to work for him, but SOI#3 declined.

17. On 11/15/2014, I met and interviewed Adult Victim 1, known to law enforcement but for his/her protection and for the purposes of this Affidavit, called "AV#1". AV#1 stated that AV#1 worked for a pimp named "Bill Bill" from February 2012 to May 2013. On 01/14/2015, AV#1 viewed a photograph and identified "Bill Bill" as ADAMS. AV#1 stated that when AV#1 first met ADAMS, ADAMS told AV#1 that he could offer a better life to AV#1. ADAMS told AV#1 that he would take care of AV#1 and that he would teach AV#1 how to "make real money." ADAMS told AV#1 that he already had females working in North Dakota. ADAMS told AV#1 that the females do

9

prostitution dates for him, make money for him, and that they were well taken care of. ADAMS told AV#1 that he loved AV#1 and that eventually AV#1 would fall in love with him. ADAMS told AV#1 that AV#1 would be able to send money to his/her family. ADAMS had a number of luxury vehicles that AV#1 observed, including a Bentley, a Mercedes, a BMW, and a pickup type vehicle. All of the vehicles were two doors, newer, white in color with bright red interior.

18. The following day, ADAMS picked up AV#1 and took AV#1 to get a driver's license because AV#1 needed a driver's license to ride the train. Once AV#1 had a license, ADAMS took AV#1 to the Amtrak train station in Milwaukee and gave her money for a ticket to Williston, ND. ADAMS gave AV#1 a telephone number of a female "JAZ", who AV#1 later identified as SHANIKA WALKER, DOB: 01/xx/1992. When AV#1 arrived at the Vegas Hotel in Williston, ND, ROSS, WALKER and another female, CORRINE RUSSELL, were all staying at the Vegas Hotel in a single room. Within the hour of arriving to the hotel room, WALKER had already set up a prostitution date for AV#1. AV#1 never had to post advertisements for dates. ROSS, WALKER and RUSSELL all posted the advertisements for AV#1 on Backpage.com. WALKER gave AV#1instructions about how much to charge a customer, to get the money first before the date starts, and to hide the money right after AV#1 received it. AV#1 gave all of the money he/she received to WALKER most of the time; however, sometimes AV#1 would give the money to RUSSELL.

19. ADAMS hit AV#1 on two occasions. AV#1 stated that slapping females was part of the "whole pimp thing." The first time ADAMS slapped AV#1 was because AV#1 did not answer a question fast enough and the second time was for giving ADAMS "attitude."

20. ADAMS put AV#1 and the females that returned to Milwaukee up in a hotel while they were in Milwaukee in between trips to ND. AV#1 could not leave the hotel and had to wait for ADAMS to stop into the hotel to provide AV#1 food. ADAMS would also have sexual intercourse with AV#1 when he stopped in and when he "felt like dealing with her." The only female that didn't

10

stay in a hotel was ROSS. The only time ROSS would stay at the hotel in Milwaukee was when ADAMS and ROSS were fighting. ADAMS and ROSS lived together in a house in the suburbs. AV#1 described the house as a brick, single family home, with a two car garage. I have verified this general description from my view the house at the address of 1122 N. 119th Street, Milwaukee, on Google Maps. AV#1 did not think that the house was in ADAMS'S name. ADAMS had a number of women that he trusted, with good credit, that he would use to place his assets in their names. AV#1 knew that ADAMS had a girlfriend, "DONNA," that worked a day job at a bank. AV#1 thought that ADAMS'S house may have been in DONNA's name.

21. AV#1 was allowed to return to Milwaukee for approximately two weeks the entire time that AV#1 was with ADAMS. ADAMS would normally allow his females to return to Milwaukee after two weeks as long as they "behaved." If any of the females misbehaved, the females would not be allowed to return to Milwaukee and would have to continue working in ND. Examples of misbehaving included getting too drunk or giving ADAMS attitude over the phone. WALKER would have to stay in ND a lot and was not allowed to return to Milwaukee. ADAMS told AV#1 that he was a pimp and he didn't have to leave Milwaukee because his females do what they tell him to do. AV#1 witnessed ADAMS punch WALKER in the face on one occasion.

22. According to AV#1, ROSS, WALKER and RUSSELL collected all the money made in ND and were each responsible for sending the money made back to ADAMS via Western Union. On a number of occasions, AV#1 was asked to send money via Western Union in her real name as well as under fake names. ADAMS also had a US Bank account that ROSS, WALKER and RUSSELL all deposited money into.

23. AV#1 had approximately 10 prostitution dates per night and began keeping a log of the money that she made until WALKER said to her "you think he (referring to ADAMS) is going to care or let you have any of that (money)." AV#1 was never allowed to keep any of the money she made

11

and when she needed things such as food or toiletries, either ROSS, WALKER, or RUSSELL would have to buy the items for AV#1. AV#1was told by ADAMS he/she would be in ND for two weeks; however, after a month of being there, ADAMS told AV#1 he/she needed to stay longer. AV#1 did not feel like he/she was being taken care of and had a family member purchase a train ticket for her back to Milwaukee. AV#1 had not been able to send money to AV#1's family nor did AV#1 receive any of the nice things ADMAS had promised. After AV#1 left, ADAMS began repeatedly calling AV#1 and ADAMS would show up at AV#1's residence since he knew where AV#1 and his/her family lived. ADAMS also contacted AV#1 via Facebook Messenger and told AV#1 to "come back to Daddy."

24. AV#1 stated that ADAMS attempted to sweet talk AV#1 but also used veiled threats that AV#1 had better return to ADAMS when AV#1 left ADAMS. Even though she had left ADAMS, AV#1 was still extremely scared of ADAMS. AV#1 stated that ADAMS had a lot of money and could pay people to do what he wanted.

25. AV#1 identified a photo of female named "Goldy" as JESSICA TOWNSEND. AV#1 stated that TOWNSEND worked for ADAMS when she was 17 years old and had heard that TOWNSEND was again working for ADAMS.

26. On 03/05/2015, following an undercover prostitution sting, BCI Special Agent Remus-Kvande, met and spoke with Adult Victim 2, known to law enforcement but for his/her protection and for the purposes of this Affidavit, called "AV#2." AV#2 stated that he/she had been in Williston, ND for one and a half months doing prostitution dates for money. AV#2 stated that he/she was living at the Home Place Hotel; however, AV#2 had been moving from hotel to hotel. AV#2 stated that the room had been reserved under the name CRYSTAL HALL and that AV#2 had used HALL's identification to get the hotel room. AV#2 stated that prior to getting dropped off at the undercover date, AV#2 had met with a female named "Ray."

12

27. SA Remus was informed by surveillance outside the hotel that AV#2 had been dropped off by another female. Law enforcement officers followed the female and witnessed the female pick up another female at a different hotel. Law enforcement officers made contact with both females. The females were identified as RASHEDA ROSS and CRYSTAL HALL, both from Milwaukee. Law enforcement officers recovered ten cellular telephones from the one vehicle.

28. On 05/04/2015, ADAMS had a police contact with the Sheboygan County Sheriff's Department and provided Sheboygan County Investigator Traas with a home address of 1122 N. 19th Street, Milwaukee, WI. Both ROSS and HALL were arrested and charged with human trafficking.

29. On 06/11/2015, Detective McNamee of the Williams County Sheriff's Office in North Dakota, conducted an interview of Adult Victim 3, known to law enforcement but for his/her protection and for the purposes of this Affidavit, called "AV#3." AV#3 stated that he/she arrived in Williston, ND from Milwaukee, WI on Saturday 06/06/2015 via Amtrak. AV#3 stated that the money he/she earned in Williston, ND had to be given to a female, RASHEDA ROSS. ROSS had told AV#3 that ROSS would send the money that AV#3 made to AV#3's family in Milwaukee, WI. AV#3 never received any information or confirmation that the money AV#3 had earned was sent to his/her family. AV#3 stated that AV#3 met ROSS through AV#3's pimp and was sent to Williston, ND by AV#3's pimp. AV#3's pimp told AV#3 to contact ROSS when AV#3 arrived in Williston. AV#3 did not post her own advertisements. ROSS posted AV#3's advertisements on Backpage.com. AV#3 stated that ROSS posted the telephone number and AV#3 was not aware of what telephone number was posted. AV#3 stated that ROSS or HALL were the drivers that took AV#3 to do the prostitution dates. AV#3 stated that ROSS was the female in charge.

30. On 09/16/2015, Detective Lynda Stott of MPD and I, met with Adult Victim 4, known to law enforcement, but for his/her protection and for the purposes of this Affidavit, called"AV#4." AV#4 stated that AV#4 met ADAMS through his/her friend. ADAMS was driving a white Astin

13

Martin with red interior. ADAMS wanted AV#4 to ride in his car with him. While in the car, ADAMS talked about himself and the assets he had. ADAMS and AV#4 went to dinner at a restaurant along with two others. While at dinner, ADAMS called a female that was "out of town" via Facetime on his cellular telephone. Also at dinner, ADAMS pulled up his Instagram account on his phone and showed AV#4 photos of females, photos of his cars, and images and postings to the account that made reference to pimping and prostitution. AV#4 stated that ADAMS used the Instagram account "Bill.Bill."

31. Approximately two days later, ADAMS invited AV#4 to a movie. ADAMS picked AV#4 up in a Chrysler sedan and drove to the north side of Milwaukee to pick up another female, "RAE" later identified by AV#4 as RAESHONDA LOVE, 02/xx/1987. AV#4 stated that he/she thought that ADAMS had bought LOVE a house. Prior to the movie, ADAMS spoke to AV#4 regarding going "out of town." ADAMS again Facetimed the same female, later identified by AV#4 as MADELINE SANTAELLA. Following the movie, ADAMS took AV#4 to the Days Inn Hotel, located off of Highway 100. AV#4 was tired and did not like the hotel; however, ADAMS said "it was fine." AV#4 believed that ADAMS knew the manager of the hotel because ADAMS did not pay for the room. ADAMS and AV#4 had sexual intercourse that night.

32. The following morning, ADAMS again spoke to AV#4 about going "out of town." ADAMS told AV#4 that he would get a percentage of whatever AV#4 made. ADAMS told AV#4 that he would purchase AV#4 a vehicle since AV#4 needed a car and ADAMS would provide AV#4 with cash any time AV#4 needed cash. ADAMS told AV#4 that AV#4 would leave that day and ADAMS would pay for AV#4 to get his/her nails and hair done. ADAMS dropped off AV#4 and told AV#4 to pack a bag and he would be back in two hours.

33. Approximately two hours later, ADAMS picked up AV#4 and took AV#4 to get his/her i-Phone fixed at the Apple Store and to get his/her hair and nails done at Roses Nail and Spa. After this,

14

ADAMS took AV#4 to the train station. ADAMS gave AV#4 money for the train ticket and told AV#4 to buy a ticket to "Willis, ND." AV#4 bought a train ticket to Williston, ND. ADAMS gave AV#4 SANTAELLA's telephone number and told AV#4 to contact SANTAELLA when AV#4 arrived.

34. When AV#4 arrived in Williston, SANTAELLA picked AV#4 up in a silver Acura. SANTAELLA later told AV#4 that the Acura belonged to ADAMS. When they arrived at the Travel Host, which AV#4 described as being a low-end hotel, SANTAELLA told AV#4 that SANTAELLA had a prostitution date coming to the hotel. From the time that they arrived at the hotel, SANTAELLA began talking to AV#4 about doing prostitution dates. SANTAELLA told AV#4 that they did not have to worry about posting ads (placing a Backpage.com prostitution advertisement). SANTAELLA told AV#4 that another female was posting for them and fielding the calls. AV#4 said that she later learned that the female who is doing the posting was allegedly in love with ADAMS. The unknown female was a black female and was saved in SANTAELLA's phone as "SANTANA." The unknown female didn't like new females and was somewhere else in the country doing dates for ADAMS. SANTAELLA also told AV#4 that ADAMS did not like black females and would tell the black female that he did not like black females.

35. When the date arrived, AV#4 waited in the car while SANTAELLA did the date. When SANTAELLA was done with the date, SANTAELLA exited the room with her things and SANTAELLA told AV#4 to reserve a hotel room at the HOME PLACE on Dakota Parkway in Williston and to get a suite. SANTAELLA told AV#4 that she had to reserve the room because the people at the HOME PLACE did not like her there. AV#4 reserved room #247 and the hotel clerk took a copy of AV#4's driver's license.

36. Once inside the hotel room, SANTAELLA told AV#4 that AV#4 had a date. SANTAELLA had four phones; two were for incoming calls for AV#4 and two were for SANTAELLA. Initially SANTAELLA was taking the incoming calls for both SANTAELLA and AV#4 but eventually the calls

15

would go through the unknown, out of state, black female. When this first call came in, AV#4 was surprised and was not quite sure what to do. SANTAELLA gave AV#4 lube and condoms. The unknown female setting up the date, would tell SANTAELLA how much the date would be paying. SANTAELLA would then tell AV#4 what the date agreed to pay. A sex act was never discussed with the customer prior to the date. SANTAELLA instructed AV#4 to text SANTAELLA how much money she received prior to the date, and after doing the date, SANTAELLA would text ADAMS after each time AV#4 received money. AV#4 would text SANTAELLA when she was done with the date. SANTAELLA told AV#4 to get the money first and to hide the money in the Kleenex box in the bathroom or inside the toilet paper holder. SANTAELLA told AV#4 not to worry about the length of time she was with the date unless AV#4 had back to back dates.

37. AV#4 said that the average charge for the date was $300, but AV#4 would also have dates that paid $150 or $200. The first night AV#4 arrived, after doing dates at the hotel, AV#4 and SANTAELLA went to an out call at a hotel. There were approximately five men at the hotel room. SANTAELLA and AV#4 were each paid $300. After some time, SANTAELLA and AV#4 continued to hang out with the guys for a while. One of the men wanted to go back to AV#4's hotel room. The man paid AV#4 an additional $300. AV#4 told SANTAELLA that since the man had already paid AV#4 $300, AV#4 should be able to keep the additional $300 and ADAMS would never have to know. SANTAELLA struggled with allowing AV#4 to keep the money. SANTAELLA was fearful ADMAS would find out. AV#4 and SANTAELLA talked about it further and they both agreed not to tell ADAMS. SANTAELLA allowed AV#4 to keep the $300.

38. Early the following morning, the unknown female sent a text to SANTAELLA that AV#4 had a date coming. AV#4 and SANTAELLA were exhausted. AV#4 was tired and did not want to do the date. AV#4 told SANTAELLA to tell the unknown female that she was tired and busy. SANTAELLA left the room because the date was there. Right after SANTAELLA left, AV#4 received a phone

16

call from ADAMS. ADAMS immediately said, "You're tripping." ADAMS told AV#4 that "that is not how this works," that AV#4 needed to be available at all times and that AV#4 could not turn away dates. AV#4 told ADAMS, "You haven't even talked to me." AV#4 did not feel she could turn dates away following the conversation with ADAMS. AV#4 noticed that SANTAELLA was hardly doing any dates compared to AV#4. AV#4 estimated that she did about 10 to 20 dates each day for the 13 days that she was in Williston. At the end of every day, SANTAELLA would Western Union the money they made to ADAMS.

39. Both SANTAELLA and ADAMS told AV#4 to delete all text messages from ADAMS and SANTAELLA from her phone as soon as they are sent. AV#4 started to keep track of her dates and the amount of money she was earning; however, after a while, when she began to realize that she was not going to receive any of the money she was making, she stopped. AV#4 knew she made over $8,000, but ADAMS told a friend of hers that she had made him $15,000.

40. SANTAELLA was allowed to buy food for SANTAELLA and AV#4; however, it was not three times a day and they very rarely bought other items. There was an occasion when AV#4 and SANTAELLA went to Walmart. AV#4 wanted to buy an $8 bottle of shampoo and put the bottle of shampoo in their shopping cart. While there, SANTAELLA got on the phone with ADAMS. When SANTAELLA got off the phone with ADAMS, SANTAELLA told AV#4 that ADAMS told SANTAELLA to put the shampoo back.

41. Prior to leaving for Williston, ADAMS told AV#4 that she would be in North Dakota for two weeks. Shortly before the two weeks were up, AV#4 asked ADAMS what day she would be leaving. ADAMS told AV#4 that she would leave on the 13th of September (2015). AV#4 was upset because AV#4 knew that this was a lot longer than two weeks. SANTAELLA had been in North Dakota for six months. AV#4 was fearful that AV#4 would be in North Dakota even longer than September 13th and that ADAMS would keep postponing her return home to Milwaukee.

AV#4 decided to leave Williston when he/she realized she would be staying longer than two weeks. AV#4 contacted a previous customer and he took AV#4 to the train station. AV#4 used the $300 she had previously kept to buy the train ticket.

42. From the time AV#4 met ADAMS, they communicated on occasion through Facebook Messenger as well as Instagram. AV#4 stated that the Facebook account for ADAMS was "Bill Bill" and his Instagram Account was "Bill.Bill."

43. On 10/14/2015, AV#4 used a cellular telephone to access the Facebook Account of SANTAELLA. I viewed the photos posted on the account and observed a photograph of two females and a male. AV#4 identified one of the females as being SANTAELLA and the male as being ADAMS. The posted text associated with the photograph was "Out with the Boss."

44. On 10/26/2015, ADAMS was a victim in a shooting and provided MPD Police Officer Mcaleer with a home address of 4045 N. 44th Street, Milwaukee, WI. As a witness to the shooting, CRYSTAL W. HALL was interviewed by Detective Davis of the MPD. HALL stated ADAMS'S Facebook Account was "Bill Bill" and provided her Facebook Account as "Crystal C Mack Hall."

45. On November 2, 2015, DCI Special Agent Jake Jansky viewed ADAMS'S Instagram account titled "Bill.Bill." SA Jansky viewed an image posted approximately 1 week prior to November 2 that depicted ADAMS with his hands together with a caption that was authored by "Bill.Bill" indicating the following:

> "Praying to the Pimp God!!!! No more faggot ass bitches!!!!"

46. SA Jansky viewed several other images on the Instagram account which contained the word "Pimps," and several containing what appeared to be expensive jewelry and exotic vehicles. Another image viewed had the words: "Sell more Pu$$y" depicted. That image was posted approximately 5 weeks prior SA Jansky's viewing on November 2, 2015.

47. On November 2, 2015, SA Jansky viewed ADAMS'S Facebook account titled "Bill Bill." In doing so, SA Jansky viewed an image posted by ADAMS which stated: "Stop liking all my pictures hoe... and choose up!!." SA Jansky knows from training and experience that "hoe" is a term commonly used to describe a female involved in prostitution, and the term "choose up" refers to a female selecting, or being forced to work for a particular individual or "pimp," making money by having sex, and the money would be turned over to said "pimp."

48. On 11/4/2015, DCI Agent Bodo Gajevic queried probation and parole of the address provided by ADAMS since an open source query of the Wisconsin State Circuit Court Access Website indicated that ADAMS is on probation through March of 2017. Probation and parole provided DCI Agent Gajevic with a current address for ADAMS of 1122 N. 119th Street, Milwaukee, WI.

**APPLICABLE TERMS**

49. Based on my training and experience, I know the following technical terms to convey the following meanings:

   a. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and

19

playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. The "Internet" is a collection of computers that are connected to one another via high-speed data links and telephone lines for the purpose of sharing information and services. Connections between Internet computers may exist across state and international borders, even if those computers are located in the same state. In order to access the Internet, an individual telephone must subscribe to an access provider, which operates a host computer system with direct access to the Internet.

c. Computers or other electronic devices and media. Images and video files, and their associated remnants, can reside on electronic media for years after initial use. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers and laptop computers has grown exponentially within the last several years. Hard drives with a capacity of just one gigabyte, which is considered extremely small by current standards, can store thousands of images at very high resolution. I also know that a forensic lab is the best place to properly analyze electronic evidence.

d. An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178.) Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet services providers control a range of IP addresses. Some computers have

20

static – that is, long term 0 IP addresses, while other computers have dynamic 0- that is, frequently changed – IP addresses.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

50. Based on my knowledge, training and experience, I know that electronic devices such as cell phones, computers, and digital cameras can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some periods of time on such devices. This information can sometimes be recovered with forensic tools.

51. Forensic evidence. As further described in ATTACHMENT A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Internet application accounts were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be stored within the data provided by the Internet websites because:

   a. Data preserved by the Internet application can provide evidence of a file or communications that were once on the web application but have since been deleted or edited, or of a deleted portion of a file (such as a photograph that has been deleted from an account).

   b. Forensic evidence on an Internet website or application can also indicate who has accessed or controlled the account. The "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how electronic data is presented may, after examination in its proper content, be able to draw conclusions about how the content was used, who accessed them and when.

21

d. The process of identifying the exact electronically stored information on a web application that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data is stored on a computer is evidence may depend on other information stored on a computer and/or the application of knowledge about how a computer and/or application behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

52. Further, in finding evidence of how an internet application or device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

## FACEBOOK and INSTAGRAM

53. In my training and experience, I know that Facebook owns and operates free-access social networking websites Facebook and Instagram, both of which can be accessed at http://www.facebook.com. Facebook and Instagram allows its users to establish accounts with Facebook and Instagram, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook and Instagram users, and sometimes with the general public.

54. Facebook and Instagram ask users to provide basic contact information to Facebook and Instagram, either during the registration process or thereafter. This information may include the user's full name, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

22

55. Facebook and Instagram users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook and Instagram user can make information available only to himself or herself, to particular Facebook and Instagram users, to all Facebook and Instagram users, or to anyone with access to the Internet, including people who are not Facebook users. Facebook and Instagram accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook and Instagram.

56. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "Mini-Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

57. Profiles include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

58. Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other

23

Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

59. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

60. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

61. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

62. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

63. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

64. Instagram permits users to post photos to their profiles on Instagram and otherwise share photos with others on Instagram, as well as certain other social-media services, including Flickr, Facebook, and Twitter. When posting or sharing a photo on Instagram, a user can add to the photo: a caption; various "tags" that can be used to search for the photo (e.g., a user made add the tag #vw so that people interested in Volkswagen vehicles can search for and find the photo); location information; and other information. A user can also apply a variety of "filters" or other visual effects that modify the look of the posted photos. In addition, Instagram allows users to make comments on posted photos, including photos that the user posts or photos posted by other users of Instagram. Users can also "like" photos.

65. Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password. This information is collected and maintained by Instagram.

66. Instagram asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profile. This information may include the user's full name, e-mail addresses, and phone numbers, as well as potentially other personal information provided directly by the user to Instragram. Once an account is created, users may also adjust various privacy and account settings for the account on Instagram. Instagram collects and maintains this information.

67. Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public. Friends on Instagram may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles. Instagram collects and maintains this information.

25

68. Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user. Users may also "unfollow" users, that is, stop following them or block the, which prevents the blocked user from following that user.

69. Instagram allow users to post and share various types of user content, including photos, comments, and other materials. Instagram collects and maintains user content that users post to Instagram or share through Instagram.

70. Users on Instagram may also search Instagram for other users or particular types of photos or other content.

71. For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app. Among the log file information that Instagram's servers automatically record is the particular web requests, any Internet Protocol ("IP) address associated with the request, type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

72. Instagram also collects and maintains "cookies," which are small text files that are placed on a user's computer or mobile device and that allows Instagram to identify the browser or device's accesses to the service.

73. Instagram also collects information on the particular devices used to access Instagram. In particular, Instagram may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access Instagram.

74. Instagram also collects metadata associated with user content. For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information.

26

75. Instagram also may communicate with the user, by email or otherwise. Instagram collects and maintains copies of communications between Instagram and the user.

## CONCLUSION

76. I submit that this Affidavit supports probably cause for search warrants authorizing the search of the Internet application accounts listed and described in Attachment A.

**ATTACHMENT A**

**Property to be Searched**

This warrant applies to information associated with the following Facebook users that are stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

    a.  Facebook Account: "Bill Bill," UID: 100007474267345;

    b.  Facebook Account: Crystal C Mack Hall; UID "ceison"; and

    c.  Facebook Account: MADDY SANTAELLA.

## ATTACHMENT B

### Particular Things to be Seized

**I.  Information to be disclosed by Facebook:**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

a.  All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b.  All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

c.  All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

d.  All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.  All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f.  All "check ins" and other location information;

g.  All IP logs, including all records of the IP addresses that logged into the account;

h.  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i.  All information about the Facebook pages that the account is or was a "fan" of;

j.     All past and present lists of friends created by the account;

k.     All records of Facebook searches performed by the account;

l.     All information about the user's access and use of Facebook Marketplace;

m.     The types of service utilized by the user;

n.     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

o.     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

p.     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**II.    Information to be seized by the government**

All information described above in Section I. that constitutes fruits, evidence and instrumentalities of Information, correspondence, or content pertaining to the sex trafficking of minors or by force, fraud, or coercion, in violation of 18 USC §1591, or transportation of individuals for the purposes of prostitution, in violation of 18 §2421, involving William ADAMS, including, for each account or identifier listed on the search warrant and application, information pertaining to the following matters:

a.  Communications or discussions regarding sex trafficking, prostitution or pimping;

b.  Communications related to photos/attachments.

c.  Information on Backpage.com or other websites used to post prostitution ads or any and all photographs and/or communication corroborating prostitution acts and/or locations;

d.  Communications related to grooming or the recruitment of victims.

e.  Communications between the user IDs identified in Attachment A and others that shows discussion of age in relation to sex trafficking, prostitution or pimping activities;

f.  Communications between the user IDs identified in Attachment A and others that shows the past, current or future education, employment, residence or location;

g.  Any dates, times and geographic locations that the users IDs identified in Attachment A were active on their Facebook accounts;

h. Any photographs posted on Facebook page of the user IDs identified in Attachment A which identify the account holders and any co-conspirators or aiders and abettors involved with sex trafficking, prostitution or pimping;

i. Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.